**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *Plaintiff-Appellee*, <br><br> v. <br><br> AT&T MOBILITY LLC, a limited liability company, *Defendant-Appellant*. | No. 15-16585 <br><br> D.C. No. 3:14-cv-04785-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted En Banc September 19, 2017
San Francisco, California

Filed February 26, 2018

Before: Sidney R. Thomas, Chief Judge, and Stephen Reinhardt, Susan P. Graber, M. Margaret McKeown, William A. Fletcher, Johnnie B. Rawlinson, Milan D. Smith, Jr.,[*] N. Randy Smith, Jacqueline H. Nguyen, Paul J. Watford and Michelle T. Friedland, Circuit Judges.

Opinion by Judge McKeown

---

[*] Judge Milan D. Smith, Jr. was drawn to replace Judge Alex Kozinski, who retired after oral argument but before this opinion was published.

## SUMMARY[**]

### Federal Trade Commission

The en banc court affirmed the district court's denial of AT&T Mobility's motion to dismiss an action brought by the Federal Trade Commission ("FTC") under Section 5 of the FTC Act, alleging that AT&T's data-throttling plan was unfair and deceptive.

AT&T Mobility's data-throttling is a practice by which the company reduced customers' broadband data speed without regard to actual network congestion. Section 5 of the FTC Act gives the agency enforcement authority over "unfair or deceptive acts or practices," but exempts "common carriers subject to the Acts to regulate commerce." 15 U.S.C § 45(a)(1), (2). AT&T moved to dismiss the action, arguing that it was exempt from FTC regulation under Section 5.

As a threshold issue, the en banc court held that the federal district court had federal question jurisdiction because the dispute was one "arising under federal law," and the motion to dismiss was more properly treated as a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim.

The en banc court held that the FTC Act's common-carrier exemption was activity-based, and therefore the phrase "common carriers subject to the Acts to regulate commerce" provided immunity from FTC regulation only to

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the extent that a common carrier was engaging in common-carrier services. In reaching this conclusion, the en banc court looked to the FTC Act's text, the meaning of "common carrier" according to the courts around the time the statute was passed in 1914, decades of judicial interpretation, the expertise of the FTC and Federal Communications Commission ("FCC"), and legislative history.

Addressing the FCC's order, issued on March 12, 2015, reclassifying mobile data service from a non-common-carriage service to a common carriage service, the en banc court held that the prospective reclassification order did not rob the FTC of its jurisdiction or authority over conduct occurring before the order. Accordingly, the en banc court affirmed the district court's denial of AT&T's motion to dismiss.

## COUNSEL

Michael Kellogg (argued) and Mark C. Hansen, Kellogg Huber Hansen Todd Evans & Figel P.L.L.C., Washington, D.C.; David L. Anderson, Sidley Austin LLP, San Francisco, California; for Defendant-Appellant.

Joel Marcus (argued), Director of Litigation; Matthew M. Hoffman and David L. Sieradzki, Attorneys; David C. Shonka, Acting General Counsel; Evan Rose, Matthew D. Gold, and Linda K. Badger, Of Counsel; Federal Trade Commission, Washington, D.C.; for Plaintiff-Appellee.

Jacob M. Lewis, Associate General Counsel; Scott M. Noveck, Counsel; Jacob M. Lewis, Associate General Counsel; David M. Gossett, Deputy General Counsel; Howard J. Symons and Brendan Carr, General Counsel;

Federal Communications Commission, Washington D.C.; for Amicus Curiae Federal Communications Commission.

Seth E. Mermin, Samantha K. Graff, and Thomas Bennigson, Public Good Law Center, Berkeley, California, for Amici Curiae Consumers Union, Consumer Federation of America, Consumer Federation of California, Consumer Action, National Association of Consumer Advocates, National Consumers League, Center for Digital Democracy, Center for Democracy & Technology, Electronic Privacy Information Center, Benton Foundation, Common Sense Kids Action, and Privacy Rights Clearinghouse.

Paul K. Ohm, Professor, Georgetown University Law Center, Washington, D.C.; William McGeveran, Associate Professor, University of Minnesota Law School, Minneapolis, Minnesota; for Amici Curiae Data Privacy and Security Law Professors.

Charles Duan, M. Ryan Clough, John Gasparini, Sara Kamal, and Jaime Petenko, Public Knowledge, Washington, D.C., for Amicus Curiae Public Knowledge.

Adin H. Rosenbaum and Sean M. Sherman, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Senator Richard Blumenthal.

Andrew Jay Schwartzman and Laura Moy, Institute for Public Representation, Georgetown University Law Center, Washington, D.C., for Amicus Curiae Social Justice Organizations.

Patrick J. Massari, Michael Pepson, and Cynthia Crawford, Cause of Action Institute, Washington, D.C., for Amicus Curiae Cause of Action Institute.

Henry Weissmann, Munger Tolles & Olson LLP, Los Angeles, California; Donald B. Verrilli Jr. and Chad I. Golder, Washington, D.C.; for Amici Curiae Charter Communications, Comcast Corporation, Cox Communications, and Verizon.

## OPINION

McKEOWN, Circuit Judge:

Although this case began as an effort by the Federal Trade Commission ("FTC") to address AT&T Mobility's "data throttling"—a practice by which the company reduced customers' broadband data speed without regard to actual network congestion—the central issue is one of agency jurisdiction and statutory construction.

Section 5 of the Federal Trade Commission Act ("FTC Act"), which gives the agency enforcement authority over "unfair or deceptive acts or practices," exempts, among others, "common carriers subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(1), (2). The question is whether the common-carrier exemption is activity-based, meaning that a common carrier is exempt from FTC jurisdiction only with respect to its common-carrier activities, or status-based, such that an entity engaged in common-carrier activities is entirely exempt from FTC jurisdiction.

We affirm the district court's denial of AT&T's motion to dismiss. Looking to the FTC Act's text, the meaning of "common carrier" according to the courts around the time the statute was passed in 1914, decades of judicial interpretation, the expertise of the FTC and Federal

Communications Commission ("FCC"), and legislative history, we conclude that the exemption is activity-based. The phrase "common carriers subject to the Acts to regulate commerce" thus provides immunity from FTC regulation only to the extent that a common carrier is engaging in common-carrier services.

This statutory interpretation also accords with common sense. The FTC is the leading federal consumer protection agency and, for many decades, has been the chief federal agency on privacy policy and enforcement. Permitting the FTC to oversee unfair and deceptive non-common-carriage practices of telecommunications companies has practical ramifications. New technologies have spawned new regulatory challenges. A phone company is no longer just a phone company. The transformation of information services and the ubiquity of digital technology mean that telecommunications operators have expanded into website operation, video distribution, news and entertainment production, interactive entertainment services and devices, home security and more. Reaffirming FTC jurisdiction over activities that fall outside of common-carrier services avoids regulatory gaps and provides consistency and predictability in regulatory enforcement.

## Background and Procedural History[1]

In 2007, AT&T Mobility LLC ("AT&T") was the exclusive provider of mobile data services for the Apple iPhone. AT&T initially offered iPhone customers a service plan with "unlimited" mobile data for a flat monthly fee. In 2010, however, AT&T stopped offering unlimited mobile data plans to new smartphone customers. Instead, AT&T

---

[1] This background description is drawn from the FTC's complaint.

offered "tiered" mobile data plans. Under the new tiered plans, a customer who exceeded a specified data allowance would be charged for any additional data at a rate set by AT&T. Legacy customers who previously signed up for unlimited data, however, were grandfathered and allowed to keep their existing service plans.

In 2011, AT&T began reducing the data speed for its unlimited mobile data plan customers—a practice commonly known as "data throttling." For example, if a customer with an unlimited mobile data plan exceeded a certain usage limit, AT&T would substantially reduce the speed at which the customer's device would receive data for the balance of the customer's billing cycle. Customers experienced reduced speed when they exceeded the preset limit, regardless of actual network congestion. AT&T did not apply the data-throttling practice to customers on tiered plans.

According to the FTC, AT&T made limited disclosures about its data-throttling practice. Although AT&T did alert some customers about the practice via text message, a monthly bill, or e-mail, it did not inform unlimited data customers of the degree to which their data speed would be reduced. AT&T's wireless customer agreements for unlimited data customers did not reveal that the use of more than a specified amount of data would trigger a slowdown. Nor did AT&T disclose that speed reductions were intentional rather than the result of network congestion.

Based on these practices, the FTC brought suit against AT&T under Section 5 of the FTC Act. 15 U.S.C. § 45. The FTC alleged that AT&T's data-throttling program was unfair and deceptive because the company advertised "unlimited mobile data," but in fact imposed restrictions on data speed for customers who exceeded a preset limit.

AT&T moved to dismiss the suit, arguing that it was exempt from FTC regulation under Section 5 because it is a "common carrier[] subject to the Acts to regulate commerce." 15 U.S.C. § 45(a)(2). In AT&T's view, the common-carrier exemption may be invoked so long as an entity has the "status" of a common carrier. That is, if an entity qualifies as a common carrier, all of its activities are immune from regulation under Section 5, regardless of whether the entity provides both common-carriage and non-common-carriage services.

In response, the FTC claimed that AT&T was exempt from jurisdiction only "to the extent that it provides a common carrier service." In the FTC's view, the common-carrier exemption applies only to the extent that an entity actually engages in common-carrier activities. Under this "activity-based" interpretation, an entity's non-common-carriage activities are subject to FTC regulation. At the time the FTC filed suit, mobile data provision was not a "common carrier service."

While AT&T's motion to dismiss was pending, the FCC issued an order changing its classification of mobile data, such that it would be treated as a common-carriage service rather than a non-common-carriage service, but "only on a prospective basis."[2] *See In the Matter of Protecting and Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5734 n.792 (2015) (the "Reclassification Order").

In response to this regulatory change, AT&T took the position that it was a common carrier under any construction

---

[2] The D.C. Circuit rebuffed AT&T's challenge to the legality of the FCC's Reclassification Order in *United States Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).

of Section 5, and that the FTC was no longer empowered to pursue its claims, either past or present, against the company. The FTC countered that the lawsuit remained live against AT&T's pre-Reclassification Order data-throttling practices.

The district court denied AT&T's motion to dismiss. In concluding that AT&T was not exempt from FTC oversight, the court examined judicial opinions contemporaneous with the Act's passage. The court found that around 1914, "[a]n entity was deemed a common carrier when it had the status of [a] common carrier *and* was actually engaging in common carriage services." Other factors supported this historical interpretation. The district court read the FTC Act broadly and its exemptions narrowly because the FTC Act is a remedial statute. The court also analyzed the legislative history, afforded the FTC's interpretation some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and observed that exempting AT&T from FTC jurisdiction would "result in significant regulatory gaps." The district court also determined that the Reclassification Order did not compel dismissal because it "appl[ies] only on a prospective basis." Upon AT&T's motion, the district court certified for immediate appeal the order denying dismissal.

We granted AT&T's unopposed petition for interlocutory review, and a panel of our court reversed. *FTC v. AT&T Mobility LLC*, 835 F.3d 993 (9th Cir. 2016). The panel "conclude[d], based on the language and structure of the FTC Act, that the common carrier exception is a status-based exemption and that AT&T, as a common carrier, is not covered by section 5" of the Act. *Id.* at 998. In the panel's view, the "plain language of the common carrier exemption casts the exemption in terms of status, contrary to the FTC's position." *Id.* The panel stated that a status-based

interpretation was "bolstered by examination of the statutory history of the Packers and Stockyards exemption [to the FTC Act]," the FTC's decisions before an amendment to that exemption, and other legislative history. *Id.* at 999–1001.

We granted rehearing en banc.**[3]** *FTC v. AT&T Mobility LLC*, 864 F.3d 995 (9th Cir. 2017).

## Analysis

As a threshold matter, we review de novo the district court's ruling on a motion to dismiss. *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011). AT&T moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), framing the issue as whether the district court possessed "subject-matter jurisdiction over the FTC's complaint, notwithstanding the fact that 15 U.S.C. § 45(a)(2) deprives the FTC of regulatory jurisdiction over 'common carriers subject to the Acts to regulate commerce.'"

AT&T's characterization of its motion is incorrect. Although AT&T disputes the FTC's regulatory jurisdiction, the district court had federal question jurisdiction because the dispute was one "arising under" federal law. 28 U.S.C. § 1331; *see also United States v. Alisal Water Corp.*, 431 F.3d 643, 650 (9th Cir. 2005) (noting that "absent statutory direction to the contrary, a district court validly exercises its jurisdiction over actions 'arising under' federal

---

**[3]** In connection with en banc proceedings, we received eight amicus briefs from a broad array of interested parties, including the FCC, consumer groups, data privacy and security law professors, government officials, media and technology companies, and non-profit organizations. The briefs were helpful to our understanding of the implications of this case from various points of view. We thank amici for their participation.

laws"). The motion is more properly treated as a Rule 12(b)(6) motion for failure to state a claim. Although this important point of civil procedure does not affect the outcome here, it may have consequences in other cases.

## I. THE TEXT and HISTORY OF THE FEDERAL TRADE COMMISSION ACT

We now turn to the merits, focusing on the text and history of the FTC Act and related statutes.

### A. Section 5 and the "Common Carrier" Exemption

We begin with the pivotal provision and its enigmatic exemption. *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (affirming the principle that statutory construction starts "with the language of the statute itself") (internal quotation marks omitted). Section 5 of the FTC Act prohibits "unfair methods of competition" and "unfair or deceptive acts or practices" in or affecting commerce. 15 U.S.C. § 45(a)(1). The section also authorizes the FTC to enforce those prohibitions:

> The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, *except* banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, *common carriers subject to the Acts to regulate commerce*, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as

provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

*Id.* § 45(a)(2) (emphases added).

This appeal focuses on the part of that section exempting "common carriers subject to the Acts to regulate commerce" from the FTC's enforcement authority. The statute leaves undefined the terms "subject to" and "common carriers." Nonetheless, the statutory structure provides at least one significant interpretative benchmark. "Banks" are wholly exempt from the section, whereas common carriers are exempted only to the extent that they are "subject to the Acts to regulate commerce." The defined term "Acts to regulate commerce" currently includes both the Interstate Commerce Act of 1887 ("ICA"), 49 U.S.C. § 10101 *et seq.*, and the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* 15 U.S.C. § 44. At the time the FTC Act was passed in 1914, however, the term "Acts to regulate commerce" referred only to the ICA, because the Communications Act had not yet been passed. For context, we provide a brief chronology of relevant legislation related to the common-carrier exemption.[4]

The Interstate Commerce Act, passed in 1887, was the first federal law to impose duties on common carriers and applied to "any common carrier or carriers engaged in the transportation of passengers or property" interstate. Ch. 104, § 1, 24 Stat. 379; *see FTC v. Verity Int'l, Ltd.*, 443 F.3d 48,

---

[4] Because there is an alphabet-soup flavor to the history, to avoid confusion and mind-numbing reading, we use both the full names and abbreviations as appropriate for clarity.

57 (2d Cir. 2006). In addition to imposing various rules on railroad common carriers, including nondiscrimination, anti-collusion, tariff-filing, and reasonable-rate requirements, the ICA also created a regulatory enforcement body, the Interstate Commerce Commission ("ICC"). §§ 1–7, 24 Stat. at 379–382; §§ 11–12, 24 Stat. at 383.

In 1910, Congress expanded the ICA to apply to interstate telephone companies, which were also deemed common carriers. Mann-Elkins Act, Pub. L. No. 61-218, sec. 7, § 1, 36 Stat. 539, 544–45. Key here, neither the ICA nor its 1910 amendment contained a definition of "common carrier."

Against this backdrop, and during the heyday of the antitrust movement, Congress passed the FTC Act in 1914. Pub. L. No. 63-203, 38 Stat. 717; *see* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 Antitrust L.J. 1, 2 (2003) (noting that the formative antitrust movement "culminated" in passage of the FTC Act and the Clayton Act). The Act created the FTC as an enforcement agency and established its broad mandate to police unfair business conduct. §§ 1–3, 38 Stat. at 717–719; § 5, 38 Stat. at 719.

In drafting Section 5, Congress deliberately gave the FTC broad enforcement powers. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1972) (observing that Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply"). Concerned with "insidious" monopolistic business practices, Congress authorized the FTC to bring suits to vindicate public rights that individuals are "often unable to assert

against these great organized [business] powers."  51 Cong. Rec. 12,030 (1914) (statement of Sen. Newlands).  Congress in the FTC Act established a "new agency that would prosecute if the Department [of Justice] faltered, enforcing a flexible new standard that could reach where the Sherman Act might not."  Winerman, *supra*, at 74.  Because the FTC Act is a remedial statute, we are "guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

Congress did not intend the FTC to regulate common-carrier business practices, however, because the Interstate Commerce Act had already delegated that role to the ICC. *See Verity*, 443 F.3d at 57; 51 Cong. Rec. 12,030 (1914) (statement of Sen. Newlands) ("The very purpose of [the FTC Act] is to protect small businesses against giant competitors *just as we protected the shippers of the country against the giant railroad combinations . . . .*" (emphasis added)).  Hence, Congress established Section 5's common-carrier exemption to avoid interagency conflict.  *See* 38 Stat. at 719; *Verity*, 443 F.3d at 57; Winerman, *supra*, at 69 n.413. Once again, Congress chose not to define "common carrier."

The legislative history sheds some light on the intended scope of the Act, highlighting that the FTC had authority over a company engaging in endeavors beyond common-carrier work.  Tellingly, Representative Stevens, the floor manager of the House bill that would become the FTC Act, explained that "where a railroad company engages in work outside of that of a public carrier[,] . . . such work ought to come within the scope of [the FTC] for investigation." 51 Cong. Rec. 8,996 (1914).   Given his role as floor manager, Representative Stevens's comments are "entitled to substantial weight."   *Ariz. Power Auth. v. Morton*,

549 F.2d 1231, 1250 (9th Cir. 1977); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 705 (1995) (considering the statements of a floor manager in interpreting the Endangered Species Act of 1973).

The ICC continued to regulate telephone common carriers until Congress passed the Communications Act in 1934. Pub. L. No. 73-416, 48 Stat. 1064; *see Verity*, 443 F.3d at 57; *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 478 n.3 (2002). The Communications Act created the FCC, a new agency with enforcement authority over wire and radio communications—including telephone common carriers. 48 Stat. at 1064. Congress established the FCC in part because of the ICC's mounting burden regulating railroads and the emergence of state commissions governing local telephone services. *See* James B. Speta, *A Common Carrier Approach to Internet Interconnection*, 54 Fed. Comm. L.J. 225, 263 (2002). The Communications Act limits the FCC's regulatory authority over common carriers to conduct "for and in connection with [interstate or foreign] communication service," or "in connection with . . . common carrier lines of communication." 47 U.S.C. §§ 201(b), 202(b). In 1938, Congress harmonized Section 5 of the FTC Act by expanding the term "Acts to regulate commerce" to also include the Communications Act. Pub. L. No. 75-447, § 2, 52 Stat. 111.

Since passage of the FTC Act over a century ago, Congress has never defined "common carrier" or explained the meaning of the phrase "subject to the Acts to regulate commerce." Nor has Congress provided absolute clarity in the Communications Act, and the FCC has not further defined the phrase in its regulations. The Communications Act purports to define the term, but does so circularly: A

common carrier is "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy . . . ."[5] 47 U.S.C. § 153(11). With the advent of the internet and changes in communications services, the term "telecommunications carrier" was added to the Communications Act in the Telecommunications Act of 1996. Pub. L. No. 104-104, 110 Stat. 56, 60. A "telecommunications carrier" is "treated as a common carrier . . . only to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(51).

## B. Section 6

With the text and history of Section 5 providing limited guidance, albeit pointing to an activity-based interpretation, the parties spill considerable ink discussing other provisions of the FTC Act. One such provision, Section 6, governs the agency's investigatory authority. *See* 15 U.S.C. § 46(a)–(b). Like Section 5, Section 6 originated in the 1914 Act and now exempts banks and "common carriers subject to the Act[s] to regulate commerce." *Id.* § 46(a).

In 1973, Congress added a proviso to Section 6 specifying that the exception for banks and common carriers

---

[5] One reason why the Communications Act did not include a further statutory definition of common carrier may have been because the term already had developed a well-understood common-law meaning. *See* H.R. REP. No. 1918, at 46 (1934) (Conf. Rep.) (noting that "the definition does not include any person if not a common carrier *in the ordinary sense of the term*" (emphasis added)). As one commentator noted: "[C]omments of various legislators during floor debate uniformly suggest that Congress transferred the meaning of the term common carrier intact from its use in the amended Interstate Commerce Act." Phil Nichols, Note, *Redefining "Common Carrier": The FCC's Attempt at Deregulation by Redefinition*, 1987 DUKE L.J. 501, 511 (1987).

"shall not be construed" to limit the Commission's authority to gather information, investigate, or require reports "to the extent that such action is necessary to the investigation of any corporation, group of corporations, or industry which is not engaged or is engaged only incidentally in banking or in business as a common carrier subject to the Act[s] to regulate commerce." Pub. L. No. 93-153, § 408(e), 87 Stat. 576, 592.

The rationale for this amendment, which is buried in multipage legislation relating to the Mineral Leasing Act of 1920, is best explained as an effort "to go directly to the Federal Courts to seek subpoena enforcement and to obtain preliminary injunctive relief" in order to "circumvent the delays experienced in the past when the Commission was required to request and persuade the Justice Department to go to Federal Court on the Commission's behalf." 119 Cong. Rec. 22,980 (1973).

AT&T endeavors to turn the addition of the phrase "incidentally in banking or in business as a common carrier" into support for its status-based interpretation of the common-carrier exemption. 87 Stat. at 592. But the 1973 proviso does not expand or contract the FTC's underlying statutory authority. *See* §408(e), 87 Stat. at 592. Rather, the proviso strengthens enforcement tools with respect to subpoenas and preliminary injunctions. The language AT&T points to was intended only to "clarify the [FTC's] authority to compel production of data from pipeline companies," and other companies not engaged or engaged only incidentally in banking or common-carriage activities. 119 Cong. Rec. 36,610 (1973).

Further, this amendment is a classic illustration of the teaching that the "view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996). This pronouncement

makes sense because, when "a later statute is offered as an expression of how Congress interpreted a statute passed by another Congress a half century [or more] before, such interpretation has very little, if any, significance." *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (citation and internal alterations and quotation marks omitted). These principles are particularly relevant in the context of the 1973 amendment to Section 6, which was passed almost six decades after the FTC Act, and which does not modify Section 5, the key section setting out the FTC's authority.

## C. The Packers and Stockyards Exception

Another piece of the legislative puzzle, albeit of limited significance, is the packers and stockyards exception. Congress passed the Packers and Stockyards Act in 1921 to authorize the Secretary of Agriculture to regulate the activities of "packers" and "stockyards." Pub. L. No. 67-51, 42 Stat. 159. The Packers and Stockyards Act stripped the FTC of jurisdiction over "any matter" that was "subject to the jurisdiction of" the Secretary of Agriculture. *Id.* § 406(b), 42 Stat. at 169.

In 1938, Congress amended the FTC Act to exempt from the FTC's jurisdiction "persons, partnerships, or corporations *subject to* the Packers and Stockyards Act." Wheeler-Lea Act, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111–12 (emphasis added). A contemporaneous House report confirmed that the amendment "conforms to the existing practice and assures no change in view of the amendments to the Federal Trade Act," declaring that the FTC "would retain its existing jurisdiction under the provisions of the Stock Yard Act." H.R. Rep. No. 75-1613, at 3–4 (1937). Hence, Congress recognized that the FTC was already exercising jurisdiction over certain activities of entities operating as packers and stockyards and would

continue to do so—a state of affairs that would have been illogical if packers and stockyards were categorically exempt as entities.

The FTC interpreted the packers and stockyards exception as activity-based both before and after the 1938 amendment.  As the Commission found, the phrase "subject to" in the packers and stockyards exception did not strip the FTC of jurisdiction over "all activities" of packers and stockyards, as had been done "in the case of banks."  *In re Food Fair Stores, Inc.*, 54 F.T.C. 392, 399–400 (1957).  Instead, Congress denied the FTC jurisdiction only with respect to "any *matter* made subject to the jurisdiction of the Secretary [of Agriculture] by the Packers and Stockyards Act."  *Id.* at 400–01 (emphasis added).

In 1958, Congress again amended the FTC Act, modifying the language slightly to exempt "persons, partnerships, or corporations *insofar as they are subject to* the Packers and Stockyards Act, 1921."  Pub. L. No. 85-909, 72 Stat. 1749, 1750 (emphasis added).  AT&T argues that this revision demonstrates congressional intent to change the packers and stockyards exception from status-based to activity-based, and that Congress therefore must have considered the unchanged common-carrier exemption to be status-based.  But this interpretation reads far too much into a minor textual change.  Like the Section 6 revision, this amendment—adopted more than 40 years after the FTC Act and more than 35 years after the original packers and stockyards exception—hardly elucidates congressional intent in 1914.  *See O'Gilvie*, 519 U.S. at 90.

### D. Failed Amendments to the Federal Trade Commission Act

We discount AT&T's argument that failed amendments post-dating passage of the FTC Act in 1914 illuminate the Act's meaning. Not surprisingly, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States v. Craft*, 535 U.S. 274, 287 (2002) (internal quotation marks and citation omitted). Such proposals lack "persuasive significance" because "several equally tenable inferences may be drawn from [congressional] inaction, including the inference that the existing legislation already incorporated the offered change." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks and citation omitted). Failed bills are particularly weak evidence compared to the more reliable sources that support the activity-based interpretation of the FTC Act—contemporaneous case law, the interpretations of the Act by the FTC and FCC, and the floor manager's comments immediately before passage.

## II. JUDICIAL INTERPRETATION OF "COMMON CARRIER"

Because the text and history of the FTC Act do not clearly illuminate the meaning of "common carrier," it is appropriate to examine the common-law meaning of the term at the time the FTC Act was passed in 1914. In doing so, we follow the Supreme Court's guidance "that where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911). The Court has consistently adopted this principle to inform its statutory

interpretation.  *See, e.g.*, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 103 (2011); *Neder v. United States*, 527 U.S. 1, 21 (1999) ("[W]here Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." (citation and internal quotation marks and alterations omitted)).    This approach is particularly appropriate here because the language of the exemption— "except . . . common carriers subject to the Acts to regulate commerce"—remains unchanged since 1914.

Critical to our interpretation, a consistent line of cases demonstrates that "common carrier" had a well-understood meaning by 1914.   Forty years before the FTC Act, the Supreme Court observed that an entity could be considered a common carrier for some purposes but not others: "A common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry."  *N. Y. Cent. R.R. Co. v. Lockwood*, 84 U.S. 357, 377 (1873).  In other words, being a common carrier entity was not a unitary status for regulatory purposes.  A business with common-carrier status acted in its capacity as a common carrier only when it performed activities that were "embraced within the scope of its chartered powers."  *Id.*

AT&T points to the Supreme Court's statement in *Lockwood* that the "nature of [an entity's] business renders [it] a common carrier" to argue that the common-carrier exemption is status-based.  *Id.* at 376.  But if anything, the Court's reference to the "nature" of the common carrier's business is more compatible with an activity-based interpretation.  Were the exemption status-based, the Court

would have had no need to refer to the *nature* of the common carrier's business activities at all, but could have stopped its analysis after concluding that the entity had the "status" of a common carrier for any purpose.

Similarly, after passage of the ICA, common carriers were subject to the ICC's jurisdiction only to the extent that they were engaging in common-carrier activities. For example, in *ICC v. Goodrich Transit Co.*, the Supreme Court highlighted the division between common-carrier and non-common-carrier pursuits by the same company. 224 U.S. 194, 204–05 (1912). The Court held that the ICC had authority to require an accounting system for a common carrier engaging in both common-carriage and non-common-carriage activities. *Id.* at 211–12. As the Court explained, "[i]f the [ICC] is to successfully perform its duties . . . it must be informed as to the business of the carriers" it seeks to regulate, and could only "properly regulate such *matters* as are really within its jurisdiction." *Id.* at 211 (emphasis added). Of importance, the Court assumed that certain non-common-carriage activities or kinds of "business" were "not within the jurisdiction of the [ICC]." *Id.*

In 1913, the year before the passage of the FTC Act, the Supreme Court observed that "[t]he great object of the law governing common carriers was to secure the utmost care in the rendering of a service of the highest importance to the community," and that therefore a "*common carrier, in the prosecution of its business as such,* is not permitted to drop its character and transmute itself by contract into a mere bailee, with right to stipulate against the consequences of its negligence." *Santa Fe, Prescott, & Phx. Ry. Co. v. Grant Bros. Constr. Co.*, 228 U.S. 177, 184–85 (1913) (emphasis added). In other words, public policy dictates that common

carriers cannot contract away their liability for negligence. But as the Court noted, "this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier." *Id.* at 185. As these contemporary decisions illustrate, entities were regulated as common carriers to the extent that they engaged in common-carrier activities.

In the years preceding the FTC Act, it also was well understood that a common carrier might be involved in other, completely different lines of business (*i.e.*, non-common-carriage activities). For example, a railroad could also engage in purely private transportation. *See Lockwood*, 84 U.S. at 377 ("[I]f a carrier of produce, running a truck boat between New York City and Norfolk, should be requested to carry a keg of specie,[6] or a load of expensive furniture, which he could justly refuse to take, such agreement might be made in reference to his taking and carrying the same as the parties chose to make . . . ."). A common carrier might also operate amusement parks, "deriv[ing] revenue from lunch stands, merry-go-rounds, bowling alleys, bath houses, etc., and collect[ing] admission fees from people entering the parks." *Goodrich*, 224 U.S. at 205. These examples belie AT&T's argument that in 1914 common carriers were single-purpose entities engaged only in common-carriage activity.

Cases decided after passage of the FTC Act further support an activity-based interpretation of the exemption. In 1931, the Supreme Court definitively stated that "[t]here is

---

[6] This archaic term can refer either to money in the form of coins rather than paper tender, or to a specific or precise form or amount. *See Specie*, OXFORDDICTIONARIES.COM, https://en.oxforddictionaries.com/definition/specie (last visited Jan. 17, 2018).

no doubt that common carriers, subject to the Interstate Commerce Act, may have activities which lie outside the performance of their duties as common carriers and are not subject to the provisions of the act." *Kan. City S. Ry. Co. v. United States*, 282 U.S. 760, 764 (1931). This proclamation reflected the Court's historical treatment of common-carrier activities. To be sure, an entity "that is subject to the [ICA]" cannot change its character by calling itself something else, such as a private carrier. *See id.*

Our approach is consistent with the Ninth Circuit's longstanding interpretation of "common carrier" under the Communications Act. We have recognized that a company may be an interstate common carrier "in some instances but not in others, depending on the nature of the activity which is subject to scrutiny." *McDonnell Douglas Corp. v. Gen. Tel. Co. of Cal.*, 594 F.2d 720, 724–25 n.3 (9th Cir. 1979). *McDonnell* aligns with the Supreme Court's interpretation of the Communications Act later that year. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n.9 (1979) ("A cable system may operate as a common carrier with respect to a portion of its service only."). More recently, we reiterated that "[w]hether an entity in a given case is to be considered a common carrier or [not] turns on the particular practice under surveillance." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1005 (9th Cir. 2010) (quoting *Sw. Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994)). This authority is particularly illuminating because the common-carrier exemption in the FTC Act explicitly references the Communications Act. 15 U.S.C. §§ 44, 45(a)(2). AT&T provides no persuasive argument for why we should overturn these precedents and adopt a novel, status-based interpretation.

Our reading also aligns with the views of our sister circuits. In a case involving regulation of cable television operators under the Communications Act, the D.C. Circuit emphasized that "one can be a common carrier with regard to some activities but not others." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976). Indeed, "it has long been held that a common carrier is such by virtue of . . . the actual activities he carries on." *Id.* (citation and internal quotation marks omitted). Resort to the common law of carriers is appropriate because of "the circularity and uncertainty of the common carrier definitions set forth in the statute and regulations." *Id.* (footnote omitted). The D.C. Circuit has since confirmed that it "is clear that an entity can be a common carrier with respect to only some of its activities," and reiterated that the term "common carrier" is "used to indicate not an entity but rather an activity as to which an entity is a common carrier." *Comput. & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198, 209 n.59 (D.C. Cir. 1982).

The Eleventh Circuit, in construing the Communications Act, has interpreted common carriers to be "entities that are engaged in providing communication services." *Eagleview Techs., Inc. v. MDS Assocs.*, 190 F.3d 1195, 1197 (11th Cir. 1999) (per curiam) (internal quotation marks omitted). Noting that the Communications Act describes a common carrier as "any person *engaged as a common carrier for hire*," 47 U.S.C. § 153(11) (emphasis added), and that the FCC's regulations interpreting the Communications Act described a common carrier as "[a]ny person engaged in *rendering communication service* for hire to the public," 47 C.F.R. § 101.3 (2017), the court concluded that "an entity is not considered a common carrier unless it is 'engaged' in rendering services." *Eagleview*, 190 F.3d at 1197.

The Second Circuit also has joined the chorus. In *FTC v. Verity International*, the court conducted a careful historical investigation of the term "common carrier" beginning with some of the phrase's earliest appearances in English common law and the writings of Lord Chief Justice Hale circa 1670. 443 F.3d at 58. Tracing legislative history and judicial interpretations of the term through 2006, the court explained that "[r]ather than rely[ing] on what an entity is authorized to do, courts must examine the actual conduct of an entity to determine if it is a common carrier for purposes of the FTC Act exemption." *Id.* at 60. The court characterized the "notion of some indelible common carrier status" as "highly questionable." *Id.* at 59 n.4 (internal quotation marks omitted).

In contrast to this long line of cases, AT&T's position that the case law supports a status-based interpretation of "common carrier" does not withstand scrutiny. AT&T highlights a passage in *Goodrich* that the ICC, in order to regulate a common carrier, "might require a knowledge of the business of the carrier." 224 U.S. at 211. But there is nothing profound about that statement. It is common sense that a regulator would need to understand the scope of a business in order to determine how and whether to regulate it. Significantly, the Court pointed out that the ICC has a legitimate interest in the overall business of a carrier so that the Commission can "regulat[e] that which is confessedly within its power." *Id.* at 214.

AT&T's reliance on *FTC v. Miller* is similarly misplaced. 549 F.2d 452 (7th Cir. 1977). There, the Seventh Circuit stated that it "need not decide whether the FTC is correct in its statement that the non-carrier activities of a common carrier do not fall within the scope of the [Section] 6 exemption [to the FTC's jurisdiction]." *Id.* at 458. The

court further explained that "[a]ssuming that to be correct, it does not follow that a corporation engaged solely in carrier activities steps outside the exemption whenever those activities are not of a type ordinarily regulated by the ICC." *Id.* Because the case involved a carrier "engaged solely in [common] carrier activities," the court did not need to wrestle with the issue we confront. *Id.*[7]

Nor do the other cases cited by AT&T—all of which endorse the FTC's expansive enforcement authority—support AT&T's position. In *Official Airline Guides, Inc. v. FTC*, for example, a non-airline publisher of airline schedules argued that it was free from FTC oversight under the FTC Act's analogous exemption for "air carriers . . . subject to the Federal Aviation Act." 630 F.2d 920, 923–24 (2d Cir. 1980) (quoting 15 U.S.C. § 45(a)(2)). The Second Circuit rejected that end run around the "broad mandate given to the [FTC] to enforce section 5." *Id.* at 923. Because the publisher was not an "air carrier" that was "subject to the Federal Aviation Act" under any approach, it hardly mattered to the court that the publisher engaged in some activities that "affect[ed] competition among air carriers." *Id.*

AT&T repackages the failed arguments made by regulated parties in such cases: it claims company-wide protection from the FTC because it engaged in *some* activities performed by an exempted party—in this case, a common carrier. Courts routinely rejected such arguments

---

[7] We do acknowledge, however, that the court hinted at a conflicting interpretation despite its disclaimer that it was not deciding the question. *See Miller*, 549 F.2d at 458.

in these cases, instead favoring the FTC's broad enforcement authority.

### III.   AGENCY INTERPRETATION OF THE COMMON-CARRIER EXEMPTION

Consistent with the longstanding judicial interpretation of the exemption, the FCC and the FTC both urge us to adopt an activity-based interpretation of the term "common carrier." As the FCC states in its amicus brief, "the agencies have historically understood the FTC to have jurisdiction over non-common-carrier services of entities that also engage in common carriage services within the exclusive jurisdiction of the FCC."

According to the FCC, "the Communications Act and the FTC Act fit hand-in-glove to ensure there is no gap in the federal regulation of telecommunications companies, while also conferring the FCC with exclusive jurisdiction over common-carrier services." That regulatory harmony results from the cross-reference between the FTC Act and the Communications Act. *See* 15 U.S.C. §§ 44, 45(a)(2). As the FCC explains, the Communications Act "authorizes comprehensive common-carriage regulation of telecommunications providers only when they are engaged in common carrier activities." *See, e.g.*, 47 U.S.C. §§ 153(51), 332(c)(1). And because "the provisions of the Communications Act cross-referenced by the FTC Act's common-carrier exception are activity-based, not status-based," the common-carrier exemption "is activity-based as well." By contrast, a novel, status-based interpretation could "open a potentially substantial regulatory gap and greatly disrupt the federal regulatory scheme." In the FCC's view, the activity-based approach is therefore "the only plausible interpretation of the common carrier exemption" in Section 5.

Despite the cross-reference between the statutes, there may be some overlap between the agencies' jurisdiction when the FCC's regulations of common carriers affect the non-common-carrier activities of those entities. In a 2015 Memorandum of Understanding, the two agencies "express[ed] their belief that the scope of the common carrier exemption in the FTC Act does not preclude the FTC from addressing non-common carrier activities engaged in by common carriers." *FCC-FTC Consumer Protection Memorandum of Understanding*, 2015 WL 7261839, at *1 (Nov. 16, 2015). The Memorandum also reflects the agencies' view that the FTC's enforcement authority cannot impinge on the FCC's concurrent authority in regulating common carriers. *See id.* ("[N]o exercise of enforcement authority by the FTC should be taken to be a limitation on authority otherwise available to the FCC, including FCC authority over activities engaged in by common carriers and by non-common carriers for and in connection with common carrier services . . . .").

This Memorandum reflects a classic example of concurrent jurisdiction with two agencies sharing regulatory oversight. In the administrative context, two cops on the beat is nothing unusual. *See Thompson Med. Co. v. FTC*, 791 F.2d 189, 192 (D.C. Cir. 1986) ("[O]urs is an age of overlapping and concurring regulatory jurisdiction."). It has long been established that where two statutes apply to "the same subject, effect should be given to both if possible." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936).

For example, the FTC and the Department of Justice ("DOJ") (and the FCC with regard to certain telecommunications matters) have long had concurrent enforcement responsibilities with respect to antitrust

matters.  *See FTC v. Cement Inst.*, 333 U.S. 683, 694–95 (1948) (upholding the concurrent jurisdiction of the FTC and the DOJ over the same conduct by the same parties).  It is well accepted that the FTC "may proceed against unfair [or deceptive] practices even if those practices violate some other statute that the FTC lacks authority to administer." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009).

Such concurrent jurisdiction makes sense, as different federal agencies bring to the table discrete forms of expertise and specific enforcement powers.  The numerous examples of the FTC participating in multiagency proceedings against the same conduct belie AT&T's argument that telecommunications providers must be regulated by the FCC alone.  *See, e.g.*, *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1091 (9th Cir. 1994) (where the FTC, the Food and Drug Administration ("FDA"), and the Postal Service took action against a hair loss company due to the company's advertisements); *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 221–22 (3d Cir. 2005) (where the FTC and the FDA both commenced actions against a health product manufacturer due to the manufacturer's advertisements).

The activity-based interpretation embraced by the FTC-FCC Memorandum of Understanding is consistent with the FTC's position more than three decades earlier that, if an "ICC-regulated common carrier [were] to engage in activities unrelated to interstate transportation, such as real estate or manufacturing, which could not be regulated by the ICC, those other activities would not be exempt from FTC jurisdiction merely because they were undertaken by a common carrier subject to the ICA." *In re Mass. Furniture & Piano Movers Ass'n*, 102 F.T.C. 1176, 1983 WL 486277, at *27 (1983), *ord. rev'd in part on other grounds sub nom.*

*Mass. Furniture & Piano Movers Ass'n v. FTC*, 773 F.2d 391 (1st Cir. 1985).

The FTC echoed this view more recently in a 2002 Senate hearing, stating that it "firmly believes that only the common carrier *activities* of . . . companies are exempted." *FTC Reauthorization*: *Hearing Before the Subcomm. on Consumer Affairs, Foreign Commerce and Tourism of the S. Comm. on Commerce, Science, and Transp.*, 107th Cong. 28 (2002) (statement of Hon. Sheila F. Anthony, FTC) (emphasis added); *see also Reauthorization of the Federal Trade Commission: Positioning the Commission for the Twenty-First Century: Hearing Before the Subcomm. on Commerce, Trade & Consumer Protection of the H. Comm. on Energy and Commerce*, 108th Cong. 27 (2003) ("[T]he agency believes that the FTC Act applies to non-common-carrier activities of telecommunications firms, even if the firms also provide common carrier services.").

We are mindful that regulatory agencies such as the FTC and FCC "can bring the benefit of specialized experience to bear on the subtle questions in this case." *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001). While the FTC has disclaimed reliance on *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), we afford the agencies some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Indeed, the FTC and FCC's "power to persuade" is buttressed by the robust continuum of case law supporting their activity-based interpretation. *See id.* at 140.

AT&T points to language in a few of the FTC's briefs in other cases that may suggest the agency has not been wholly consistent in its position. Read in context, however, these cases do not squarely address the issue we consider. Nor do they represent a change in the FTC's position.

Ultimately, the structure of the statute and its contemporaneous legislative history, coupled with more than a century of judicial interpretation, align with the preferred reading and expertise of the two most important regulators with an interest in this appeal. We conclude that the exemption in Section 5 of the FTC Act—"except . . . common carriers subject to the Acts to regulate commerce"—bars the FTC from regulating "common carriers" only to the extent that they engage in common-carriage activity. By extension, this interpretation means that the FTC may regulate common carriers' non-common-carriage activities.

## IV.    EFFECT OF THE RECLASSIFICATION ORDER

Finally, we address whether the FCC's order reclassifying mobile data service from a non-common-carriage service to a common-carriage service changes the outcome of this appeal. The Reclassification Order was issued on March 12, 2015—five months after the FTC filed its suit against AT&T—and unambiguously states that the order will "apply only on a prospective basis." 30 F.C.C. Rcd. 5601, 5734 n.792. AT&T's data-throttling program spanned from at least 2011 until the time that the FTC filed its complaint in 2014, well before the Reclassification Order became effective.

The Reclassification Order's explicit text and the "generally applicable presumption against retroactivity" confirm that the FTC's Section 5 authority to bring cases concerning mobile data services has been curtailed only for services rendered after the order became effective. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950–51 (1997); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994) ("[C]ongressional enactments and administrative rules will not be construed to

have retroactive effect unless their language requires this result . . . ." (internal quotation marks omitted)).

The presumption against retroactivity applies with particular strength here because the Reclassification Order affects the substantive rights of the parties. *See Hughes Aircraft*, 520 U.S. at 951. Specifically, the enforcement powers of the FTC and FCC differ in material respects. The FCC is not authorized to seek refunds for injured consumers, and its enforcement authority is limited to conduct going back one year. *See* 47 U.S.C. § 503(b)(6). Hence, applying the Reclassification Order retroactively would strip the government of the opportunity to seek restitution on behalf of millions of customers affected by AT&T's data-throttling program.

Contrary to AT&T's position, the prospective Reclassification Order does not rob the FTC of its jurisdiction or authority over conduct occurring before the order. The FTC's power to bring enforcement lawsuits in federal court derives from the FTC Act, which authorizes the agency to sue in any case involving "any provision of law enforced by" the FTC. 15 U.S.C. § 53(b)(1). Before the reclassification, the FTC had the authority to pursue this suit. The prospective reclassification can hardly be viewed to retrospectively strip the FTC of that enforcement authority. Nor does the Reclassification Order render this suit moot, as the FTC can still potentially achieve monetary relief for AT&T's past violations. *See FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224 n.3 (2013) ("A case becomes moot only when it is impossible for a court to grant any

effectual relief whatever to the prevailing party[.]" (internal quotation marks omitted)).**[8]**

For the reasons outlined above, we affirm the district court's denial of AT&T's motion to dismiss.

**AFFIRMED.**

---

**[8]** In early 2018, the FCC reversed its 2015 Reclassification Order and once again classified broadband internet as a non-common-carrier service. *See In the Matter of Restoring Internet Freedom*, W.C. Dkt. No. 17-108, 2018 WL 305638, at *1 (Jan 4, 2018). The 2018 order explicitly stated that it applies "only on a prospective basis." *Id.* at n.973. The parties spar over whether this order moots the appeal. AT&T renews its argument that the FTC lost jurisdiction to press this suit after the FCC's 2015 Order and so all litigation must cease. We conclude the appeal is not moot. The FTC derived its jurisdiction from the FTC Act, and neither of the FCC's Reclassification Orders applies retroactively.